UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA

| | |
|---|---|
| JOSEPH JIMENEZ, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>WALMART INC. d/b/a WALMART #4137, and J. Does 1-10,<br><br>Defendants. | No. 3:22-cv-05585-BAT<br><br>DECLARATION OF LEVI DIXON IN OPPOSITION TO WALMART INC.'S MOTION FOR SUMMARY JUDGMENT |

Levi Dixon declares under oath:

1. I have been retained by the Plaintiff to provide expert opinion in the above-entitled cause of action. I am over eighteen years of age and competent to testify. I am not a party to this action.
2. I am an engineer at Applied Cognitive Sciences in Mica, Washington. I am a Certified Safety Professional, Associate Human Factors Professional, and Certified XL Tribometrist. I have a M.S. degree in Human Factors & Ergonomics. My Curriculum Vitae is attached as Exhibit A.
3. I have been retained by the Plaintiff to provide expert opinion regarding the hazards and safety protocols in the area where Mr. Jimenez fell while walking, causing injury. The



**Wattel & York, LLC**
6314 19th St W Ste 15
Fircrest, WA 98466-6223
Tel: (253) 471-1075
Fax: (253) 471-1077

opinions I express in this declaration and in my attached report are made on a more probable than not basis.

4. I have reviewed an approximately two-hour surveillance video of the area where Ms. Jimenez fell, Mr. Jimenez's responses to Interrogatories, and Walmart's responses to Interrogatories. Walmart's interrogatory responses included the surveillance video and Walmart's spill, trip, and fall guidelines. I also interviewed Mr. Jimenez about the incident.

5. My opinions are:

    a. The wet tile flooring was in a slippery and hazardous condition for at least one hour prior to Mr. Jimenez's fall.

    b. Based on its use of warning signs and floor mats, Walmart was aware that the subject flooring was slippery and unsafe under the foreseeable conditions that existed in this area of the facility.

    c. Despite being aware that the floor was slippery and unsafe when wet, Walmart relied on ineffective safety measures to mitigate the hazard.

    d. Walmart violated its own safety policies/procedures by failing to dry the vestibule flooring prior to Mr. Jimenez's fall, despite multiple employees walking through the wet and slippery area.

    e. Mr. Jimenez was behaving in a manner that was consistent with foreseeable human behavior.

6. Further explanation for these opinions may be found in my report, a true and accurate copy of which is attached as Exhibit B.



**Wattel & York, LLC**
6314 19th St W Ste 15
Fircrest, WA 98466-6223
Tel: (253) 471-1075
Fax: (253) 471-1077

# EXHIBIT A

Applied Cognitive Sciences


Levi Dixon, M.S., CXLT, ASP, AHFP
10501 South Lambs Lane
Mica, WA 99023
Phone/Fax: (509) 624-3714
Email: Levi@ACSciences.com


## LICENSES:

*Associate Human Factors Professional – January 2018*

- By the Board of Certification in Professional Ergonomics
- License Number: 2208

*Associate Safety Professional – 2015*

- By the Board of Certified Safety Professionals
- License Number: 24715

*Certified XL Tribometrist – 2015*

- By the International Safety Academy
- License Number: 1511574

## EDUCATION:

*San José State University – 2018*

- M.S. in Human Factors & Ergonomics
- Department of Industrial & Systems Engineering
- GPA: 4.0 out of 4.0

*Eastern Washington University – 2015*

- B.S. in Technology – Manufacturing Option
- Department of Engineering
- Graduated Cum Laude

## PROFESSIONAL EXPERIENCE:

*Applied Cognitive Sciences – 2014 to Present*
I was initially hired as an intern and shortly thereafter appointed to a full time permanent position as an Assistant Engineer, wherein I took on a broader area of responsibilities including: reading and generating summaries of discovery material, accident case file material, and depositions; conducting research in the field of safety and risk management; and conducting accident scene site inspections which involves making relevant field observations, taking measurements and photographs, documenting all relevant information, as well as conducting both on scene and laboratory testing. As an Assistant Engineer, I was involved in the investigation and analysis of several hundred legal cases, for both the plaintiff and defense, nationwide. I am currently an Associate Engineer wherein the focus of my work is in human factors and safety and risk management. My areas of expertise include, but are not limited to: facility design and fall-at-elevation accidents, workplace injuries, and automotive accidents.

*Davenport Hotels – 2009 to 2016*
I was originally hired as part of the Banquet Setup staff, and shortly thereafter was promoted to a supervisory position. As a supervisor, I was responsible to ensure a large and diverse team worked together effectively and efficiently to provide excellent service to all guests. One of the largest responsibilities I had was maintaining a high level of safety for guests and employees alike, by ensuring the safety protocols were properly implemented and enforced. By working with a small team of supervisors and management, we would work to minimize the risk of workplace injuries by ensuring that the entire staff knew the proper safety protocols for various situations.

## HONORS AND AWARDS:

*San José State University*

- Nominated by Faculty for the “Bertha Kalm” Scholarship

*Eastern Washington University*

- College of Science, Technology, Engineering, and Mathematics “Outstanding Student” Award

- Dean’s List Winter 2012, Spring 2012, Fall 2012, Winter 2013, Fall 2013, Spring 2014, Fall 2014, and Winter 2015

- “High Demand Student” Scholarship for 2014-2015 academic year

- “High Demand Student” Scholarship for 2013-2014 academic year

*Davenport Hotels*

- “Guest Worthy” Award in February 2015

- “Superstar of the Quarter” Award in Fall 2012

## PUBLICATIONS:

- DeBusk, H., Dixon, L., Gill, J., Gill, R. (2019). Measuring the Static Coefficient of Friction of Non-Fluid Contaminants. *Proceedings of the Human Factors and Ergonomics Society Annual Meeting,* (63)1, 537-541.

- Dixon, L., and Nathan-Roberts, D. (2017). Watch Out! Or do we? A Review of Literature on Human Locomotion, Visual Gaze, and Expectation of Trip Hazards. *Proceedings of the Human Factors and Ergonomics Society Annual Meeting*, (61)1, 1252-1256.

## PRESENTATIONS:

- Dixon, L., and Nathan-Roberts, D. Watch Out! Or do we? A Review of Literature on Human Locomotion, Visual Gaze, and Expectation of Trip Hazards. Presented at the Human Factors and Ergonomics Society 2017 Annual Meeting, October 2017.

- Gill, R., and Dixon, L. Human Factors Engineering. Invited Presentation by the Rotary Club of Spokane, November 2015.

## PROFESSIONAL MEMBERSHIPS:

- Human Factors and Ergonomics Society
  - Puget Sound Chapter

- American Society for Testing and Materials
  - F13 Committee

## CONTRACTS:

- Slip Resistance Testing of Pool Deck and Alternative Flooring Treatments; Kahala Nui; Principal Investigator; 2018 - 2019.

- Evaluation of Product Disclaimer, Packaging, and Product Insert for Single-use Pass/Fail BAC Testers; Think Twice; Co-Investigator; 2018.

- Evaluation of Product Label and Safety Instructions for Multi-Plug; Davis Company; Principal Investigator; 2018.

- Testing Slip Resistance of Alternative Flooring Treatments; Four Seasons Hotel, Ko Olina; Co-Investigator; 2016.

## REVIEWER:

- The Human Factors and Ergonomics Society's 2019 Annual Meeting Proposal Reviewer for the Forensics Professional Technical Group and the Safety Technical Group

## CONTINUING EDUCATION:

- Attended the Human Factors and Ergonomics Society Annual Meeting; Austin, Texas; October 2017.

- Institute of Police Technology and Management (IPTM) "At-Scene Traffic Crash/Traffic Homicide Investigation" 80 Hour Course; Certificate #nA71YIHz8L; August 2017.

# EXHIBIT B

Applied Cognitive Sciences

January 27, 2023

Zach Hansen
Wattel & York
6314 19th Street West
Suite 15
Firecrest, Washington 98466

**RE: Jimenez vs Walmart**

Dear Mr. Hansen:

As requested, I reviewed the discovery material you provided concerning Mr. Jimenez's slip and fall incident at the Walmart located at 1965 South Union Avenue in Tacoma, Washington. I also had the opportunity to discuss this incident with Mr. Jimenez. This incident is similar to a number of other falls at elevation (i.e., slip and fall, trip and fall, misstep and fall, etc.) that I have assisted in investigating and analyzing over the past 8 plus years, including numerous slip and falls in on the brown vestibule tile that is common in Walmart facilities. Based on this information, my education, training, and experience in falls at elevation, the following letter summarizes my findings to date concerning Mr. Jimenez's slip and fall. This report is based on the information that has been made available to me to date; thus, I reserve the right to further expand and/or amend my opinions and their bases as additional information relevant to my area of expertise becomes available. In addition, I have not had the opportunity to conduct an inspection of the facility; hence, I reserve the right to do so and to modify/revise my conclusions accordingly, if necessary.

My curriculum vitae highlights my training, experience, and expertise as it pertains to Human Factors Engineering and Safety and Risk Management. I have a B.S. in Technology – Manufacturing option and a M.S. in Human Factors & Ergonomics; I have 13 years of experience in Safety and Risk Management with my emphasis being in Human Factors Engineering for the past 8 years. In addition, I have provided consulting services to private industry and businesses in the fields of Safety and Risk Management and Human Factors Engineering. Also, as noted in my CV, I am a Certified Human Factors Professional, a Certified Safety Professional, and a Certified Tribometrist (i.e., one that measures the slip resistance of walking surfaces).

**Material Reviewed**

1. Surveillance Video

2. Plaintiff's Responses to Walmart's First Set of Interrogatories and Requests for Production of Documents
3. Walmart's Responses to Plaintiff's First Set of Interrogatories and Requests for Production of Documents

**Background**

On December 19, 2019, Mr. Jimenez arrived at Walmart and entered the facility. While attempting to obtain a shopping cart from the cart corral area, Mr. Jimenez stepped across an entryway floor mat/runner. However, as he stepped off the floor mat/runner and onto the wet tile, his left foot suddenly and unexpectedly slipped forward, which resulted in him losing his balance and falling to the ground, wherein he suffered a broken ankle. Figure 1 below is a screenshot taken from the surveillance video showing the area of the incident. Notice that there are multiple floor mats on the ground as well as two warning signs, which indicate that Walmart was aware that the floor was in a wet and slippery condition. However, these safety measures were ineffective at mitigating the slippery condition of the walkway, as discussed in detail below.




**Figure 1. Mr. Jimenez Slipping Between Floor Mats**

**Preliminary Opinions**

1. The wet tile flooring was in a slippery and hazardous condition for at least one hour prior to Mr. Jimenez's fall.

2. Based on its use of warning signs and floor mats, Walmart was aware that the subject flooring was slippery and unsafe under the foreseeable conditions that existed in this area of the facility.

3. Despite being aware that the floor was slippery and unsafe when wet, Walmart relied on ineffective safety measures to mitigate the hazard.

4. Walmart violated its own safety policies/procedures by failing to dry the vestibule flooring prior to Mr. Jimenez's fall, despite multiple employees walking through the wet and slippery area.

5. Mr. Jimenez was behaving in a manner that was consistent with foreseeable human behavior.

**General Fall Hazards**

The hazards associated with falls are well understood. Up until the late 1920's falls were the leading cause of accidental deaths in the United States. From the late 1920's and up until recently, automobiles were the number one cause of accidental deaths, and falls were the second leading cause; this changed when poisoning/drug overdose became the number one cause of accidental deaths. Just recently, the National Safety Council reported that in 2019 alone, there were approximately 8 million injuries and 40,000 deaths from falls. Falls were the number two leading cause of preventable death and number one leading cause of preventable injury. Through most of the last 80 or so years, falls have accounted for more accidental injuries and deaths than the next four categories combined.[1]

Falls at elevation are particularly troublesome for the walking public both in frequency of occurrence and the severity of injury. For years, falls have been the number one cause of accidental injuries in the hospitality industry, fast food industry, large retail stores, and are the leading cause of accidental injuries in U.S. buildings. The management of fall hazards is one of the most fundamental responsibilities faced by any business establishment and its risk manager. The hazards created by the contamination (i.e., water, hydrocarbons, organic growth, and so forth) of walkways are notoriously hazardous. The degree of potential injury is extreme if a user fails to detect these hidden hazards; an uncontrolled slip and fall onto a rigid walkway can cause severe injuries. Furthermore, the hazard is typically "hidden" from the user or patron's perspective (i.e., due to limitations in our vision); hence they cannot take any actions to avoid it.

**Slip Resistance**

The extent to which a surface can resist the slipping of a person's foot can be determined by measuring the coefficient of friction, which technically is called the slip resistance index if the surface is contaminated. The coefficient of friction is defined as the ratio of the minimum horizontal force necessary to induce motion divided by the vertical force acting on the object. To illustrate, imagine placing a 10-pound block of steel on a horizontal flat surface. A cord is tied to the steel block and the force pulling on the cord is slowly increased until the block starts to move. If the pulling force that initiated motion was 7 pounds, then the coefficient of friction between the two surfaces would be 0.7 (i.e., 7 pounds divided by 10 pounds is 0.7).

Generally speaking, the coefficient of friction ranges from 0.0 to 1.0; the higher the number the greater the ability to resist slipping. To put these values in perspective, the coefficient of friction for typical shoes on smooth ice is around 0.1 to 0.15 and on rough ice it generally ranges from 0.2 to 0.25. Alternatively, automotive tires and rubberized shoes on a good asphalt road can

---

[1] National Safety Council Injury Facts

produce coefficients of friction as high as 0.8. Since the 1950's there have been a number of publications, textbooks, and the like stating that static coefficient of friction for a horizontal walking surface must be at least 0.50 or above to be considered slip resistant and reasonably safe.

**Slip Hazard**

To date, I have not been afforded the opportunity to conduct an inspection of the flooring in the area where Mr. Jimenez slipped and fell. Notwithstanding, the preponderance of evidence indicates that the floor was in a slippery and hazardous condition at the time of this incident. Factors that support this opinion include:

1. Prior Investigations
   It should be noted that I have been involved in the investigation and analysis of several slip and fall incidents on substantially similar tile flooring in the vestibule of other Walmart facilities. In fact, in early 2023 I personally measured the slip resistance of the brown vestibule tile in another Walmart in Western Washington, which revealed that the slip resistance when wet was in the range of 0.40. In other words, my testing in that matter showed that the brown vestibule tile was hazardous for pedestrians when wet and did not provide safe traction.

2. Mr. Jimenez's Behavior
   As noted above, it has been widely discussed that the coefficient of friction for a horizontal walking surface must be **at least .50** or above to be considered slip resistant and reasonably safe. Research has shown that under conditions when walking in a straight line and at a normal pace, the average person only requires a coefficient of friction to walk without slipping in the range of 0.25 to 0.35.

   In this case, the video shows that Mr. Jimenez was walking in a straight line at a casual pace. Under such conditions, Mr. Jimenez would have only required a modest coefficient of friction to not slip and fall. In other words, given Mr. Jimenez's behavior (i.e., walking in a straight line at a casual pace, not making an aggressive maneuver/turn, and so forth), it is reasonable to conclude that the coefficient of friction or slip resistance in the area where Mr. Jimenez slipped and fell was **less than 0.50** at the time of this incident, which is consistent with my slip resistance testing of substantially similar vestibule tile in another Walmart.

3. Surveillance Video
   My review of the surveillance video shows that there were at least two other instances where patrons walking in the vestibule near the mats and wet floor signs slipped **and fell**, as shown in the photographs below. These other slip and fall illustrate that the safety measures taken by Walmart **were not effective at controlling the slippery and hazardous floor**. As will be discussed in depth below, wet floor signs are known to be ineffective at controlling slip and fall hazards because the hazard still exists and even if one is behaving in a "cautious" manner, as the sign directs them to, they are still at risk of falling.




**Figure 2. Customer Slip and Fall**




**Figure 3. Customer Slip and Fall**

4. <u>Use of Caution: Wet Floor Sign</u>
   My review of the surveillance video shows the use and placement of an orange wet floor caution sign placed on a bollard near the front entrance door along with a yellow wet floor caution sign placed on the tile further into the facility. Notably, both warning signs have a pictogram of a person slipping and falling. While these signs would not be effective at mitigating the hazard for a variety of reasons (see discussion below), which is also illustrated in the surveillance video where multiple patrons slip while near the signs, it does confirm that Walmart recognized that the floor in this area was slippery and unsafe at the time of this incident.

5. <u>Use of Floor Mats</u>
   As shown above, Walmart placed floor mats over portions of its vestibule tile. In other words, Walmart had prior knowledge that its vestibule did get slippery when wet and that it was foreseeable that the floor would become wet on the day of this incident. This safety measure taken by Walmart to mitigate the slip hazard (i.e., placement of mats on only some areas of the walkway) was not adequate to prevent its customers from falling (i.e., such as when they stepped off the mat), especially since it would be expected that after entering, pedestrians would walk towards the shopping carts to obtain one, where they would naturally have to step off the mat and onto the floor that Walmart appreciated did get slippery and unsafe when wet.

**Safety Standards**

The American Society of Testing and Materials (ASTM) promulgated its standard ASTM F 1637-95, "Standard Practice for Safe Walking Surfaces" in 1995. It should be noted that the standard, as per Section 1.1, "Scope", puts forth minimum **design**, construction, and **maintenance** standards for new and existing (emphasis added) buildings. This formalized safety standard has been reissued a number of times since 1995 and still contains the same general safety requirements discussed below. Section 4.1.3 of ASTM F 1637-95 specifically requires that walkways shall be slip resistant under expected environmental conditions and use. Section 4.1.4 specifically mandates that "interior walkways that are not slip resistant when wet shall be maintained dry during periods of pedestrian use".

As noted above, the evidence I have reviewed to date indicates that Walmart appreciated that the subject floor was not slip resistant when wet. However, despite Walmart's recognition of the slippery conditions created when wet, the surveillance video shows that the general area where Mr. Jimenez slipped was not maintained dry. That is, in the approximate one hour prior to Mr. Jimenez's slip, the video shows that employees repeatedly walked through this area and no efforts were made by Walmart to maintain the tile in a dry (such as with mopping). This is of particular concern because Walmart's own safety policies generally require the use of mops to maintain the slippery vestibule tile dry, which Walmart clearly failed to do in this instance prior to Mr. Jimenez's slip.

The point to be made is that Walmart recognized that this tile does get slippery and unsafe when wet, and despite being an area that would be subject to routine contamination (such as from water tracked in on shoes and/or shopping carts), Walmart failed to even attempt to dry the floor in this area in the hour prior to Mr. Jimenez's slip and fall despite multiple employees walking through the general area. In light of the foregoing discussion, it is clear that Walmart failed to conform to these basic safety requirements of ASTM F 1637-95 at the time of Mr. Jimenez's slip and fall, which ultimately resulted in Mr. Jimenez being exposed to a hazardous condition (along with numerous other pedestrians, including at least two other who ultimately slipped and fell as well).

**Mitigation of Hazard**

*Methodology Used in Safety and Human Factors Engineering*

When generating or creating a plan to control a known hazard such as a floor that is slippery when wet, the fields of Human Factors Engineering and Safety use a hierarchical process to determine the mitigation strategy to employ. The first and most effective tier is to Eliminate or Design-Out the hazard (i.e., Safety by Design). If all means of Eliminating/Designing-Out the hazard are exhausted and it is determined that Eliminating/Designing-Out the hazard is not practicable or feasible, then the implementation of Engineering Controls or Guarding should be considered. In the event that neither Eliminating/Designing-Out nor Engineering Controls or Guarding can be implemented, then the lowest tier and least effective level, Administrative Controls/Warnings, should be implemented. It is critical to note that Administrative Controls/Warnings are the least effective because altering behavior is not reliable; in other words, the more a mitigation strategy relies on the human component to protect users from the hazard, the less effective it will be. As such, it is critically important that if one resorts to Administrative Controls that they be implemented consistent with state-of-the-art methodologies.

*Safety Measures for Slippery Wet Floors*

Following the hierarchical approach discussed above, there are a variety of safety measures that can be used to mitigate the hazards associated with slip and falls on this tile. Given the environment (i.e., a high-traffic area near the front entrance) where it was clearly foreseeable, and expected, that the floor would become wet/contaminated (i.e., water tracked in on shoes, shopping carts, umbrellas, and the like), the most effective safety measure would have been to eliminate the slip hazard by installing a flooring material that is slip resistant when wet/contaminated rather than having a floor that is slippery/hazardous when wet. In other words, installing a slip resistant floor would have been consistent with implementing "Safety by Design" such that the floor would not be dangerously slippery even if/when it got wet. Alternatively, the tile flooring could have been treated with a slip resistant additive so as to increase the slip resistance and render it slip resistant. Based on the factors discussed above, the floor was most probably slippery/hazardous when wet and neither of these safety measures were implemented by the Defendant.

*Walmart's Deficient Safety Plan*

As discussed above, the evidence indicates that Walmart knew of and appreciated that the walkway was hazardous when wet. Rather than installing a slip resistant floor, Walmart attempted to minimize the slip hazard by using floor mats and wet floor signs. However, despite using such safety measures, pedestrians continued to be exposed to the slip hazard and in the surveillance video alone, there were three people that slipped and fell, which underscores that Walmart's safety plan was deficient and the safety measures it relied on are limited in effectiveness in this type of environment. In other words, Walmart knew and/or should have known that the safety measures it was relying on (floor mats on only some areas of the slippery tile and the placement of wet floor signs) would not reliably protect pedestrians from the slippery wet floor. Below is a discussion of the safety measures that Walmart relied on that were ineffective and which Walmart knew and/or should have known would not reliably protect pedestrians from their slippery and hazardous tile flooring.

1. Mats and Runners
   From a safety perspective, the placement of mat(s) and/or runner(s) over the slippery walkway surface provides pedestrians with a pathway to use so as to avoid haphazardly stepping on surfaces which are slippery and hazardous when wet. In this case, Walmart clearly recognized the need to place mats in the general area as evidenced by the various mats seen in the surveillance video. However, Walmart chose to place the mats such that there were large areas of exposed slippery tile between the mats, especially in the area where pedestrians would enter the facility and attempt to obtain a shopping cart, as would be expected.

   In other words, pedestrians would be protected while on the mat, but exposed to the surface that is slippery when wet after stepping off the mat, which they would essentially be required to do to obtain a shopping cart in this general area given the placement of the floor mats/runners. The bottom line is that Walmart recognized the need to provide a barrier between a pedestrian's footwear and the slippery when wet floor, yet placed the mats in a manner that made it likely that pedestrians would still step directly onto the slippery walkway where they would be exposed to the potential slip hazard especially while attempting to obtain a shopping cart, just as Mr. Jimenez was doing. In short, Walmart's use of floor mats on only some portions of the slippery tile was an ineffective mitigation strategy because once customers stepped off the mat and onto the wet tile, they would be exposed to the slippery and hazardous tile.

2. Caution: Wet Floor Signs
   In addition to floor mats, Walmart relied on the placement of Caution: Wet Floor signs placed near the front entrance. It is critical to point out that these signs do not, in and of themselves, prevent injury. They do not physically eliminate the possibility of someone slipping, falling, and sustaining injuries. Such signs only serve as a warning device (if they are perceived by pedestrians), and are not always effective as they do not necessarily indicate the location of the hazard (i.e., around the sign, under the sign, several feet from the sign, and so forth), and they do not prevent a person from encountering the danger. **The hazard or danger, such as the slippery wet walkway, continues to exist**.

   For these reasons, **safety standards advise the use of warning signs only as a temporary measure**. For example, the American National Standards Institute (ANSI) A1264.2-2012 Standard "Provision of Slip Resistance on Walking/Working Surfaces" has a dedicated section to warnings that specifically states "A warning shall be provided when a slip or trip hazard has been identified until appropriate corrections can be made or the area barricaded." The prevention measures discussed above (i.e., slip resistant surfaces, application of additives, and so forth) serve to physically eliminate or lessen the risk of a slip and fall, and more effectively prevent injury as opposed to wet floor signs. Here again, despite the warning sign being in place, there were at least 2 other slip and falls (in addition to Mr. Jimenez's) in the immediate vicinity of the warning signs, which illustrates that the **use of warning signs was an ineffective safety measure**.

   Specific to Mr. Jimenez's incident, it is critical to point out that there are other factors that would compromise the warning's ability to reliably alert Mr. Jimenez of the slippery

condition of the tile. For example, it is critical that warnings are located proximate in location to a hazard and that they are credible.[2] As seen in the surveillance video, Mr. Jimenez did walk between two wet floor signs, however, he then walked several steps **past the warning** prior to encountering the wet tile that he ultimately slipped on. In other words, the warning signs were not even placed in the location where the water was allowed to accumulate. Notably, the sign was previously placed at the location where water was allowed to accumulate, but **rather than mopping the water/drying the floor**, an **employee chose to move the wet floor sign away from the hazard**, as shown in Figure 4 below. In other words, not only did the employee move the sign away from the hazard where Mr. Jimenez ultimately fell, but the employee failed to make any effort to actually clean up the hazard, as required by Walmart's safety policies/procedures.




**Figure 4. Employee Moving Wet Floor Away from Hazard**

It is also important to point out that given Mr. Jimenez entered the facility and walked across the tile without issue. Additionally, he stepped in the immediate vicinity of the warning sign and then took approximately 4 steps past the sign prior to slipping. These factors (his benign experience on the walkway prior to the sign, taking multiple **past** the sign before slipping, and so forth) would have compromised the warning's credibility and its overall effectiveness in alerting Mr. Jimenez that there was a slip hazard several steps past the wet floor sign where employees of Walmart intentionally allowed water to accumulate without making any efforts to wipe/dry it for an hour prior to his fall. The bottom line is that Walmart's use of warning signs was an ineffective mitigation strategy that would not reliably protect their customers from the slippery and hazardous tile.

[2] Ayres, T., et al. (1989). What is a warning and when will it work?

3. <u>Administrative Controls</u>
   Based on having reviewed Walmart's safety policies/procedures in a number of other cases, along with my review of the documents provided in this case, Walmart is generally aware that the vestibule is a high-traffic area that is subject to routine contamination and potentially slippery conditions. As such, Walmart generally requires periodic cleaning in the vestibule as well as prompt liquid/spill clean-up so as to minimize the risk of pedestrians slipping and falling.

   Of particular concern in this case is that for over an hour prior to Mr. Jimenez's fall, there is water on the tile that multiple employees walk past, along with an employee that actually takes the warning sign from the water accumulation and moves it to another area of the tile, as shown above. Notwithstanding, none of the employees make any effort to mop/dry the wet floor, much less do they stand and guard the hazard until it could be cleaned up or the area barricaded to prevent pedestrians from being exposed to the hazard. In other words, based on the surveillance video, Walmart failed to comply with its own safety policies/procedures, which permitted the wet and hazardous floor in the area where this incident occurred to exist for at least an hour prior to Mr. Jimenez's slip and fall.

*<u>Summary</u>*
Based on my analysis to date, Walmart was aware of and appreciated that the vestibule did get slippery and hazardous when wet. Rather than relying on a uniform approach to mitigate the slip hazard, such as replacing the flooring with a slip resistant surface or applying a slip resistant additive to the walkway, Walmart relied on the placement of various floor mats and warning signs, which it knew and/or should have known were ineffective safety measures. That is, despite the placement of floor mats and warning signs, pedestrians would still be exposed to the slippery and hazardous tile even if they were being "cautious" as the sign directed them to. Here again, one need only watch the surveillance video to appreciate that despite the mats and warning signs, there were **several other slip and falls** due to the slippery and hazardous tile that Walmart failed to maintain in a dry condition despite multiple employees walking through the general area. In short, Walmart appreciated the floor was slippery and hazardous, but failed to implement safety measures to effectively control the hazard; such a failure resulted in Mr. Jimenez being exposed to the slip hazard that caused his fall and subsequent injuries.

**Post Incident Actions**
It should be noted that even after Mr. Jimenez's fall, the actions of Walmart were inconsistent with basic safety principles and are a reflection of its deficient safety program. For example, the entryway mat is moved and the floor below it is mopped. Subsequently, the floor mat is put back in place such that it is overlapping/stacked on an adjacent mat, which is a safety violation as it creates a trip hazard. Additionally, shortly after placing the floor mat back over the tile that was just mopped and not likely adequately dried, a pedestrian enters the facility and the mat moves/migrates (likely because the mat was placed on the slippery wet tile) which results in the mat rippling and creating a potential trip hazard (Figure 5).




**Figure 5. Mat in Raised and Hazardous Condition**

Later on, a Walmart employee can be seen moving shopping carts at which time they create another ripple/raised area in another floor mat, thereby creating an additional trip hazard for pedestrians in the general area (Figure 6). Notably, a pedestrian walking towards the shopping carts has a near miss where their foot catches on a floor mat, as shown in Figure 7 below.




**Figure 6. Employee Creating Trip Hazard**

Foot
Caught
on Mat




**Figure 7. Pedestrian's Foot Catching on Mat**

The point to be made from this discussion is that the placement of mats not only fails to reliably protect pedestrians from the slippery tile, but it potentially creates additional hazards that expose users to a risk of tripping. In other words, the various trip hazards that were routinely being created by customers and employees alike due to the presence of floor mats/runners illustrates one reason why the use of more effective safety measures, such as eliminating the hazard through the use of a slip resistant floor, is the preferred method for mitigating slip hazards rather than placing floor mats/runners throughout the vestibule. In short, the actions and/or inactions of Walmart subsequent to Mr. Jimenez's incident are a reflection of Walmart's deficient safety program.

**Behavior of Mr. Jimenez**

*User Factors*

Based on our conversation and the surveillance video, Mr. Jimenez was behaving in a foreseeable manner at the time of his incident. For example:

1. He was not carrying anything that would have obstructed his vision or compromised his balance.

2. He was not texting/talking on a cellphone, nor was he rushing or in a hurry.

3. Mr. Jimenez was not impaired by alcohol or recreational drugs.

4. Mr. Jimenez was wearing foreseeable footwear (i.e., dress shoes).

5. He stated that he had good vision (i.e., he did not require corrective lenses for driving).

6. Prior to falling, Mr. Jimenez described that he was not feeling faint/dizzy, was not having issues with his mobility, and that he was not prone to falling.

Please let me know if I can be of any further assistance. I look forward to working with you on this matter.

Sincerely,

Levi Dixon, M.S., CXLT, CSP, CHFP
Senior Engineer